**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 25-cr-10395-DJC |
| v. | ) | |
| ERIC BANKS, | ) | |
| Defendant. | ) | |

**DEFENDANT ERIC BANKS**
**SENTENCING MEMORANDUM**

Defendant Eric Banks comes before the Court full of shame and remorse. After living a productive, law-abiding life for more than six decades—in which he spent the bulk of his career as a youth counselor, supporting some of the most vulnerable members of our society—Mr. Banks made a horrible choice. Dazzled by a promise of easy money, Mr. Banks agreed to join the scheme to which he pled guilty. It was a terrible choice, and Mr. Banks is consumed with regret.

Having admitted his criminal conduct, Mr. Banks now seeks mercy and temperance from the Court. Although the parties dispute the guidelines calculation, we respectfully submit that regardless of how that "abstract arithmetic" pans out, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) *aff'd*, 301 F. App'x 93 (2d Cir. 2008), it is completely unnecessary to put this senior citizen, first-time offender in prison. Incarceration is not necessary to protect the community or deter recidivism—Mr. Banks is 70 years old, has zero criminal history, and seeks only to live a quiet, simple life, supporting his 88-year-old mother during her remaining years. Nor is incarceration necessary to provide just punishment, reflect the seriousness of this offense,

or promote respect for the law—for while the scheme as a whole may be serious, Mr. Banks was not its mastermind and was not enriched by it. To the contrary, Mr. Banks was a pawn—one of many—used by the scheme's architects to deposit bogus checks, move dirty money, and ultimately take the fall. And while Mr. Banks may have deposited a bogus million-dollar check as part of this scheme, *he* never got that money. No fancy cars, tropical trips, or flashy jewelry for Mr. Banks. Before, during, and after his involvement in this scheme, Mr. Banks has been poor, living in his aged mother's one-bedroom apartment, where he sleeps on the couch.

Ultimately, for reasons detailed herein, we respectfully submit that a sentence of time served, followed by three years of supervised release and including six months of home confinement, would be sufficient—but not greater than necessary—to achieve the purposes of sentencing.

## MR. BANKS' BACKGROUND

Mr. Banks was born in Boston to unwed parents and had no relationship with his father. (PSR ¶¶ 40-41.) While Mr. Banks had a stepfather for part of his childhood, the two never bonded closely, and his mother and stepfather divorced when Mr. Banks was a young child. (*Id.* ¶ 41.) Thus, Mr. Banks was principally raised and supported by his mother, Lafern Humphrey. (*Id.*)

Lacking a consistent male role model at home, Mr. Banks was fortunate to find structure, support, and guidance through community programming, including football, basketball, and other sports. (*Id.* ¶ 42.) Appreciating the lessons learned from those who mentored him, Mr. Banks became a mentor himself, joining the staff of the YMCA as a day and overnight counselor, where he "loved to teach others." (*Id.*)

Mr. Banks' teenage experience as a YMCA counselor turned out to be an entrée into his primary career, youth counseling. After graduating from high school, Mr. Banks had a short stint

in college (*id.* ¶ 50) and a brief sojourn in the Navy (*id.* ¶ 51) before finding his place and his purpose, working with disadvantaged children. At Lesley University in the 1980s, Mr. Banks received training and earned certificates in counseling and anger management, which he used to help children in and around Boston. (*Id.* ¶¶ 50, 53.) For decades, Mr. Banks was a youth counselor and case manager, working for entities such as the Department of Youth Services and the Department of Children and Families, where he primarily focused on clients with physical and developmental disabilities. (*Id.* ¶ 53.)

During his prime working years, Mr. Banks was a man of industry and action, often working multiple jobs to support not only himself and his mother, but also to meet his child support obligations.[1] (*Id.* ¶¶ 45, 53.) For example, in addition to working as a youth counselor, Mr. Banks held roles in security, community policing, and construction. (*Id.* ¶ 53.) He also worked in the culinary field, serving as a cook at the Fairmont Hotel, Fours Restaurant, and Fenway Park. (*Id.*)

But after sustaining a serious back injury in 2007, Mr. Banks could no longer work fulltime. (*Id.* ¶¶ 46, 53.) Once somewhat recovered, Mr. Banks did what he could to stay active and engaged, including working as a driver for Uber and Lyft. (*Id.* ¶ 53.) But none of that work—nor his prior career—led to financial security. (*Id.* at 55 (identifying one bank account, with a balance of $33.60).) After his back injury, Mr. Banks moved in with his mother, where he still resides to this day. (*Id.* ¶¶ 43, 53.) There, he has no bedroom of his own and sleeps on the couch in the living room. (*Id.* ¶43.) As Ms. Humphrey explains, Mr. Banks is now her "sole support," as "most of [her] family is deceased," with "any surviving relatives liv[ing] outside of Massachusetts." (Ex A-1 (Lafern Letter).) Thus, "[t]he management of [her] health, home, and financial stability

---

[1] Mr. Banks has two adult daughters, with whom he unfortunately has no real relationship. He had a difficult break-up with their mother when his daughters were young, and she did not want Mr. Banks in their lives. This unfortunate reality is a source of pain and shame for Mr. Banks.

depend[ ] on [Mr. Banks'] contributions." If Mr. Banks is incarcerated, the impact on Ms. Humphrey is likely to be catastrophic—a thought that fills Mr. Banks with dread and guilt.

Today, Mr. Banks leads a quiet, simple life. He spends most of his time providing love and support to those close to him—including not only his mother, but also his companion, Rochelle O'Neal Thorpe. During their 12-year relationship, Ms. Thorpe has "observed [Mr. Banks'] close relationship with his mother and dedication to her health and well-being." (Ex. A-2 (Rochelle Letter).) She has also appreciated his friendship and support for her son, as well as her own professional pursuits. (*Id.*)

## PROCEDURAL HISTORY

Mr. Banks was charged by Complaint in June 2025 with Theft of Government Funds in violation of 18 U.S.C. § 641, regarding criminal conduct that occurred back in 2023. (*See* Complaint, Dkt. 1.) He was arrested on June 6, 2025, released on conditions that same day (Conditions of Release, Dkt. 11), and has since complied with all conditions, without incident (PSR ¶ 4).

Mr. Banks quickly accepted responsibility for his conduct, pleading guilty to an Information filed in October 2025 that charged him with six crimes: one count of Bank Fraud, in violation of 18 U.S.C. § 1344, and five counts of Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). (*See* Information, Dkt. 14.) Notably, all the crimes to which Mr. Banks pled guilty were based on the same conduct that formed the factual basis of his one-count Complaint. But the Government's decision to switch criminal statutes and stack counts increased not only Mr. Banks' number of offenses of conviction but also his advisory guidelines range.

Mr. Banks' sentencing is scheduled for February 24, 2026.

## THE SENTENCING GUIDELINES

According to Probation, Mr. Banks has an advisory guidelines range of 33-41 months imprisonment, based on a Criminal History Category of I and a Total Adjusted Offense Level of 20. (PSR ¶ 58; *id.* ¶¶ 17-28, 32-33.) But as explained below, the Total Adjusted Offense Level should be reduced by three levels, based on a mitigating role adjustment under USSG § 3B1.2. Thus, when appropriately calculated, Mr. Banks' guidelines range is 24-30 months, based on a Criminal History Category of I and a Total Adjusted Offense Level of 17.

A three-level reduction under § 3B1.2 is appropriate for two reasons:

***First***, the applicable commentary states that "a defendant who is accountable . . . for a loss amount under §2B1.1 . . . that greatly exceeds the defendant's personal gain from a fraud offense *or* who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline." USSG §3B1.2, comment (n. 3.A) (emphasis added); *see also id.* at (n. 4). Mr. Banks fits both criteria. Although he is accountable for a loss amount of more than $1.5M, he did not personally gain anywhere close to that amount. Mr. Banks' meager assets (PSR ¶¶ 55-56) make that plain. Indeed, if he had gotten any significant sum of money from this scheme, Mr. Banks would not still be residing on a couch in his mother's one-bedroom apartment, where he has been for almost two decades. (*See* PSR ¶ 43.) Furthermore, Mr. Banks did not understand the scope of the scheme in which he participated, which according to the government encompasses a variety of related cases. (*See* PSR ¶ 6.) Mr. Banks knew just one other participant—a guy who recruited, directed, and paid him small sums for doing as he was told.

***Second***, the commentary states that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline," even if the defendant's role was "essential or

indispensable" to the crime at hand. USSG §3B1.2, comment (n. 3.C). That is Mr. Banks. He did not share in the scheme's profits—he was a mope, paid to open accounts and then make deposits, withdrawals, and transfers as directed. Although Mr. Banks' repeat activities in support of the scheme may preclude him from receiving a four-level adjustment, we submit that a three-level adjustment fits. At the end of the day, Mr. Banks did not come up with this scheme, make strategic decisions to further it, or derive a substantial portion of its proceeds. He was paid to do as he was told and to serve (unwittingly) as a buffer, protecting the real masterminds from detection and apprehension.

Mr. Banks' minor role is further demonstrated by the fact that *after* his arrest, members of the scheme continued using accounts that Mr. Banks opened at their direction, *without his involvement*. For example, on August 12, 2025, the schemers sent an older, African American male into a Chase bank branch in Dedham, MA, and had that individual *pretend to be Mr. Banks* and deposit a fraudulent check for over $1M into one of the sham business accounts associated with Mr. Banks (one connected to Maxim Care Hospice). Here are still images from a Chase bank security video, showing an individual who is *not* Mr. Banks, making a fraudulent deposit:[2]






[2] Because the defense does not know who this individual is, or whether he is known to law enforcement or still under investigation, the defense has redacted part of the individual's face.

The fact that the scheme's masterminds continued using these accounts after Mr. Banks was arrested, without his involvement, underscores his minor role.

That said, even the correct guidelines range of 24-30 months is overly draconian. A better source of guidance in this case is the *Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (the "Shadow Guidelines"), commonly known as the "Shadow Guidelines." (*See* Ex. B (Shadow Guidelines.) Various jurists have referenced the Shadow Guidelines in connection with white collar sentencings, "given that the official guidelines are pegged to unhinged economic loss figures that mindlessly accelerate the resulting sentencing range." *United States v. Shapiro*, No. 14-cr-399, 2022 WL 2758129, at *1 (E.D.N.Y. July 14, 2022); *see also United States v. Fabish*, No. 12-cr-265, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015). And in a case like Mr. Banks'—involving a first-time offender whose crime was not otherwise serious—the Shadow Guidelines establish an Offense Level "cap of 10" and state that "a sentence other than imprisonment is generally appropriate." (*See* Ex. B (Shadow Guidelines) at (d).)

## APPLICABLE LAW

This Court is well acquainted with statutory factors it must consider and standards it should apply in exercising its discretion at sentencing. Chief among these is the parsimony principle, which states that sentencing courts should "'impose a sentence sufficient, but not greater than necessary, to comply with' the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)). Section 3553(a) also instructs the Court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the U.S. Sentencing Guidelines, the need to avoid unwarranted sentencing disparities,

and the need to provide restitution to victims. Notably, "a sentencing court may not presume" that a sentence within the applicable guidelines range is reasonable. *United States v. Smith*, 531 F.3d 109, 111 (1st Cir. 2008). To the contrary, "a sentencing court is not to presume that the [guideline range] invariably sets the parameters of a reasonable sentence but must make an individualized assessment based on the facts presented." *United States v. Narvaez-Soto*, 773 F.3d 282, 288 (1st Cir. 2014) (internal quotation marks and citation omitted).

## **ARGUMENT**

### **A Sentence of Home Confinement Is Appropriate Under 18 U.S.C. § 3553(a)**

Whether the Court agrees with Mr. Banks' assessment of the guidelines or Probation's, a holistic assessment of the 18 U.S.C. § 3553(a) factors demonstrates the appropriate sentence is one of time served, with three years of supervised release that includes six months of home confinement. That sentence is adequate to protect the public, achieve deterrence, and promote respect for the law, taking into account Mr. Banks' history and characteristics.

***First***, there is no need to incarcerate Mr. Banks in order to protect the public or achieve deterrence. Mr. Banks is 70 years old; he's a senior citizen who before never ran afoul of the law, and who has been a model supervisee while on federal release. There is simply no basis to believe he will commit another crime. And courts frequently find that non-custodial variances are appropriate for older offenders like Mr. Banks, who do not present risk of recidivism. *See, e.g.*, *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (finding downward variance from 60 months to probation was reasonable given defendant's age and poor health, as well as post-arrest rehabilitation); *United States v. Wadena*, 470 F.3d 735, 740 (8th Cir. 2006) (finding downward variance from 18-24 months to probation was warranted given defendant's age, deteriorating health, reduced risk of reoffending, and other factors). Indeed, courts recognize that advanced age alone is a common and compelling reason for a downward variance. *See, e.g.*, *United States v.*

*White*, 506 F.3d 635, 640 (8th Cir. 2007) ("With regard to his variance . . . things like the Defendant's age . . . are factors that can and should be considered."); *United States v. Whigham*, 754 F. Supp. 2d 239, 252 (D. Mass. 2010) ("Variances also occur because mitigating factors like mental health [and] age … can now be—and should be—considered.").

Variances based on advanced age make sense, in part, because older prisoners are both much less likely to recidivate and much more expensive to incarcerate. On this point, studies show that defendants over age 50, like Mr. Banks, exhibit markedly lower rates of recidivism. *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12, 28 (2004) (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf) (last visited Feb. 15, 2026) ("Recidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates. . . . Among all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent."). And research has established that "older prisoners cost approximately three times as much as younger prisoners to incarcerate." Brie A. Williams, et al., *Addressing the Aging Crisis in U.S. Criminal Justice Healthcare*, J. AM. GERIATR SOC., June 2012 (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC3374923/) (last visited Feb. 16, 2026); *see also* Stephanie C. Yarnell, et al., *Geriatrics and the Legal System*, J. OF AM. ACAD. OF PSYCH. AND THE LAW, June 2017 (available at https://jaapl.org/content/45/2/208) (last visited Feb. 16, 2026) ("Older prisoners are the most expensive inmates to care for, costing two to five times more . . . than younger inmates."). Thus, on average, society experiences more burden and less benefit from incarcerating senior citizens like Mr. Banks.

Here, there is no societal benefit from incarcerating Mr. Banks given that he lived his entire life before this episode—almost seven decades—with a spotless record. He has zero criminal history points not because old convictions have timed out, but because he has never before been convicted of a crime. (*See* PSR ¶¶ 30-33). That spotless record underscores his lack of a propensity for criminal conduct and the unlikelihood that he will reoffend—as does his model behavior on release in this case. Thus, there is no reason to conclude that a period of additional of incarceration is necessary to promote deterrence or protect the public.

***Second***, there is no need to incarcerate Mr. Banks to promote respect for the law or reflect the seriousness of the offense. That is so because, for a 70-year-old like Mr. Banks who has never been in trouble with the law, the stigma of this felony conviction, combined with its collateral consequences (*e.g.*, losing his right to vote) and financial burdens (*e.g.*, restitution he will never be able to fully satisfy), are very significant. Thus, no further sanction is necessary. *See United States v. Prosperi*, 686 F.3d 32, 47-48 (1st Cir. 2012) (affirming downward variances from guidelines ranges of 87-108 months to probation because defendants, among other things, had no prior convictions, and favorably citing district court's observation that "it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed"). That is particularly so because Mr. Banks, as discussed above, was no mastermind of this scheme or even a lieutenant in its hierarchy. He was a pawn—a replaceable one, at that—who did what he was told, when he was told, as he was told, and was not enriched by the crime.

In addition, the guidelines themselves recognize that first-time offenders like Mr. Banks are particularly appropriate candidates for non-incarceration sentences. *See* USSG § 5C1.1 cmt. n. 9 ("If the defendant [is a zero-point offender] and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate.").[3] And the 2024 U.S. Sentencing Guidelines—the version in effect at the time Mr. Banks pled guilty—expressly support a non-custodial sentence in this case like this one, as its commentary states that "[a] departure, *including a departure to a sentence other than imprisonment*, may be appropriate if the defendant received an adjustment under 4C1.1 . . . and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or otherwise serious offense." 2024 USSG § 5C1.2, comment (n. 10(B) (citing 28 U.S.C. § 994(j)) (emphasis added). While that version of the guidelines is not in effect today, the points made in its commentary may still be considered in the Court's section 3553(a) analysis.

Ultimately, when fashioning an appropriate sentence for a first-time offender like Mr. Banks, courts often conclude that noncustodial sentences are appropriate, even when considering crimes more serious than this one. *See, e.g.*, *Prosperi*, 686 F.3d at 47-48; *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (upholding trial court's *sua sponte* downward variance from guidelines range of 41-51 months to probation for defendant in child pornography case who had

[3] Mr. Banks does not technically qualify for this particular provision because—while he is a zero-point offender—his guidelines range is in Zone D, not Zone A or B. But a non-custodial sentence is nonetheless permissible. Indeed, in *Gall v. United States*, the Supreme Court considered the Eighth Circuit's rejection of a probationary sentence for a defendant who had a Zone D guidelines range, and it reversed the appellate court, despite the guidelines' statement that "probation alone [wa]s not an appropriate sentence" for such an offender. 552 U.S. 38, 59 (2007). In doing so, the Supreme Court observed that "§ 3553(a)(3) directs the judge to consider sentences other than imprisonment," even in Zone D cases. *Id.*

no criminal history); *United States v. Tomko*, 562 F.3d 558, 561 & n.2, 563 (3d Cir. 2009) (upholding downward variance from guidelines range of 12-18 months to probation for defendant in tax fraud case who had minimal criminal history (*i.e.*, one prior conviction for driving a boat while intoxicated)). This Court should do the same.

## CONCLUSION

For all the foregoing reasons, and those to be shared at sentencing, Mr. Banks respectfully requests that this Court impose a sentence of time served, followed by three years of supervised release that includes six months' home confinement. Further, given his financial situation, Mr. Banks requests that the Court decline to impose any fine. *See* USSG § 5E1.2(e).

DATED: February 17, 2026

Respectfully submitted,

ERIC BANKS

By his attorneys,

/s/ *Michael T. Packard*
Michael T. Packard (BBO# 676934)
Quinn Emmanuel Urquhart & Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
(617) 712-7100
michaelpackard@quinnemanuel.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to all counsel, who are registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *Michael T. Packard*
Michael T. Packard

Dated: February 17, 2026